## UNITED STATES DISTRICT COURT
## DISTRICT OF DELAWARE

| | | |
|---|---|---|
| GERALD JOSEPH LOVOI, derivatively on behalf of NETFLIX, INC. | ) ) ) | |
| Plaintiffs, | ) ) | Case No. |
| v. | ) ) | |
| RICHARD BARTON, RODOLPHE BELMER, MATHIAS DÖPFNER, TIMOTHY HALEY, REED HASTINGS, DAVID HYMAN, JAY HOAG, LESLIE KILGORE, STRIVE MASIYIWA, ANN MATHER, SPENCER NEUMANN, GREGORY PETERS, THEODORE SARANDOS, BRADFORD SMITH, and ANNE SWEENEY, | ) ) ) ) ) ) ) ) ) ) ) | JURY TRIAL DEMANDED |
| Defendants, | ) ) | |
| -and- | ) ) | |
| NETFLIX, INC., a Delaware Corporation, | ) ) | |
| Nominal Defendant. | ) ) | |

## VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT

Plaintiff Gerald Joseph Lovoi ("Plaintiff"), derivatively on behalf of Netflix, Inc. ("Netflix" or the "Company"), brings the following Shareholder Derivative Complaint (the "Complaint") pursuant to Delaware law against the Company's board of directors (the "Board") and executive officers for breaches of fiduciary duties. Except for allegations specifically pertaining to Plaintiff and Plaintiff's own acts, the allegations in the Complaint are based upon information and belief, which include but are not limited to: (i) the Company's public filings with the United States Securities and Exchange Commission (the "SEC"); (ii) pleadings filed in the Northern District Court of California; (iii) corporate governance documents available on the Company's website; and (iv) other publicly available information.

## NATURE OF THE ACTION

1.      This is a stockholder derivative action brought by Plaintiff, a stockholder of Netflix, on behalf of the Company against the Defendants.  This action alleges breaches of fiduciary duty by the Board and senior executive officers occurring from at least January 19, 2021 through April 19, 2022.  During that time, the Defendants (as defined herein) caused or allowed Netflix to issue or make materially false and misleading statements concerning the Company's financial condition and business operations.  Additionally, the Defendants caused or allowed Netflix to file false and misleading statements with the SEC.

2.      Throughout 2021, Netflix and certain executive officers made statements in documents filed with the SEC, press releases, and earnings calls, which portrayed the Company's business as healthy and its subscriber base dependable and growing.  The Company pointed to COVID-19's impacts on the global and local economies for any fluctuation in subscriber growth. These statements and suggestions were false and misleading, as Netflix became increasingly unable to add and keep new subscribers.

3.      On January 20, 2022, after the market closed, Netflix reported only net adds of 8.3 million subscribers during the fourth quarter of 2021, shy of its 8.5 million forecast.  The Company also provided weak paid net add guidance of 2.5 million subscribers for the first quarter of 2022, well under the prior year period's 4.0 million paid net adds.

4.      On this news, the Company's stock price fell $110.75, or nearly 22%, to close at $397.50 per share on January 21, 2022, on unusually heavy trading volume.

5.      On April 19, 2022, after the market closed, Netflix reported that instead of gaining 2.5 million net subscriptions, it had lost 200,000 subscriptions during the first quarter of 2022. The Company disclosed, belatedly, that account sharing and competition from other services were

hampering growth.

6.      On this news, the price of Netflix stock price fell $122.42, or over 35%, to close at $226.19 per share on April 20, 2022, on unusually heavy trading volume.

7.      Throughout this period, Defendants made materially false and/or misleading statements, as well as failed to disclose material adverse facts about the Company's business, operations, and prospects.  Specifically, Defendants failed to disclose to investors that: (1) account sharing by customers and increased competition from other streaming services were becoming significant headwinds; (2) the Company was experiencing difficulties retaining customers; (3) as a result of the foregoing, the Company's growth was decelerating; (4) as a result of the foregoing, the Company's financial results were being adversely affected; and (5) as a result of the foregoing, Defendants' positive statements about the Company's business, operations, and prospects were materially false and/or misleading and/or lacked a reasonable basis.

8.      As a result of Defendants' wrongful acts and omissions, and the precipitous declines in the price of the Company's securities, Plaintiff and other stockholders have suffered significant losses and damages.

9.      Through this action, Plaintiff seeks to hold the Board and executive officers accountable for making or causing the Company to make false and misleading statements in breach of their fiduciary duties to the Company.

10.     Netflix and Defendants Reed Hastings, Theodore Sarandos, Spencer Neumann and Gregory Peters are now the subject of securities class action litigation in this the Northern District of California captioned: *Cleveland Bakers and Teamsters Pension Fund v. Netflix Inc., Reed Hastings, Theodore Sarandos, Spencer Neumann and Gregory Peters*, Case No. 4:22-cv-03164, and Netflix and Defendants Hastings, Sarandos, and Neumann are the subject of another similar

3

securities class action litigation in this same District captioned: *Pirani v. Netflix, Inc., Reed Hastings, Ted Sarandos, and Spencer Neumann*, Case No. 4:22-cv-2672 (collectively, the "Securities Class Actions").

## PARTIES

### A.  Plaintiff

11.     Plaintiff is a current shareholder of Netflix and has continuously held Netflix stock during all times relevant hereto and is committed to retaining Netflix shares through the pendency of this action to preserve his standing.  Plaintiff will adequately and fairly represent the interests of Netflix and its shareholders in enforcing its rights.

12.     Plaintiff is a citizen of Oklahoma.

### B.  Nominal Defendant

13.     Nominal Defendant Netflix is a corporation organized and existing under the laws of the State of Delaware.  The Company's principal executive offices are located at 100 Winchester Circle, Los Gatos, California 95032.  The Company's common stock trades on the NASDAQ under the ticker symbol "NFLX."

### C.  Individual Defendants

14.     Defendant Reed Hastings is the Co-Chief Executive Officer ("Co-CEO") and President of the Company.  Defendant Hastings is also the co-founder of Netflix.  He has been a director and the Chairperson of the Company since 1997.

15.     Upon information and belief, defendant Hastings is a citizen of California.

16.     Defendant Theodore Sarandos is the Co-CEO and Chief Content Creator of the Company.  Defendant Sarandos has been a director of Netflix since 2020.

17.     Upon information and belief, Defendant Sarandos is a citizen of California.

4

18.     Defendant Jay Hoag has been a director of Netflix since 1999.

19.     Upon information and belief, Defendant Hoag is a citizen of California.

20.     Defendant Ann Mather has been a director of Netflix since 2015.   Defendant Mather is the Chair of the Audit Committee.

21.     Upon information and belief, Defendants Mather is a citizen of California.

22.     Defendant Timothy Haley has been a director of Netflix since 1998.

23.     Upon information and belief, Defendant Haley is a citizen of California.

24.     Defendant Leslie Kilgore has been a director of Netflix since 1998.   Defendant Kilgore is a member of the Audit Committee.

25.     Upon information and belief, Defendant Kilgore is a citizen of California.

26.     Defendant Strive Masiyiwa has been a director of Netflix since 2020.

27.     Upon information and belief, Defendant Masiyiwa is a citizen of South Africa.

28.     Defendant Richard Barton has been a director of Netflix since 2002.   Defendant Barton is a member of the Audit Committee.

29.     Upon information and belief, Defendant Barton is a citizen of Washington.

30.     Defendant Rodolphe Belmer has been a director of Netflix since 2018.

31.     Upon information and belief, Defendant Belmer is a citizen of France.

32.     Defendant Mathias Döpfner has been a director of Netflix since 2018.

33.     Upon information and belief, Defendant Döpfner is a citizen of Germany.

34.     Defendant Bradford Smith has been a director of Netflix since 2015.

35.     Upon information and belief, Defendant Smith is a citizen of Washington.

36.     Defendant Anne M. Sweeney has been a director of Netflix since 2015.

37.     Upon information and belief, Defendant Sweeney is a citizen of California.

38.     Defendant Spencer Neumann is the Company's Chief Financial Officer ("CFO").

39.     Upon information and belief, Defendant Neumann is a citizen of California.

40.     Defendant Gregory Peters is the Company's Chief Operating Officer ("COO") and Chief Product Officer ("CPO").

41.     Upon information and belief, Defendant Peters is a citizen of California.

42.     Defendant David Hyman is the Company's Secretary and Chief Legal Officer.

43.     Upon information and belief, Defendant Hyman is a citizen of California.

44.     Defendants Hastings, Sarandos, Hoag, Mather, Haley, Kilgore, Masiyiwa, Barton, Belmer, Döpfner, Smith and Sweeney are herein referred to as "Director Defendants."

45.     Defendants Neuman, Peters and Hyman are herein referred to as "Officer Defendants."

## JURISDICTION AND VENUE

46.     This court has jurisdiction under 28 U.S.C. §1332 because complete diversity exists among the parties and the amount in controversy exceeds $75,000.

47.     Additionally, this court has jurisdiction over each defendant named herein because each Defendant is either a corporation that conducts business in and maintains operations in Delaware or is an individual who has sufficient minimum contacts with Delaware so as to render the exercise of jurisdiction by the Delaware courts permissible under traditional notions of fair

play and substantial justice.

48.     Venue is proper in this Court pursuant to 28 U.S.C. §1391 because: (i) Netflix is incorporated in this District; (ii) one or more of the Defendants either resides in or maintains executive offices in this District; (iii) a substantial portion of the transactions and wrongs complained of herein, including the Defendants' primary participation in the wrongful acts detailed herein, and aiding and abetting and conspiracy in violation of fiduciary duties owed to Netflix occurred in this District; and (iv) Defendants have received substantial compensation in this District by doing business here and engaging in numerous activities that had an effect in this District.

## FURTHER SUBSTANTIVE ALLEGATIONS

### D.     Company Background

49.     Founded in 1997, Netflix is the world's leading streaming entertainment subscription-based service company.  In 2007, the Company launched its streaming media service. It also offers a DVD-by-mail service in the U.S.  From 2007 to 2022, Netflix significantly expanded in terms of programming, which now includes previously released movies and television programs, the Company's own original content, and gaming.  Netflix offers TV series, documentaries, feature films, and mobile games across a variety of genres and languages.

50.     According to its Form 10-K filed with the SEC on January 27, 2022, Netflix had approximately 167 million subscribers in 2019.  During 2020, when the pandemic closures were at their height, Netflix gained a record 37 million customers, representing a 31% increase from 2019's paid net additional subscribers for a total of over 203 million.

### E.     Netflix's False and Misleading Statements

51.     On January 19, 2021, the Company reported its fourth quarter 2020 financial

7

results, stating in relevant part:

> Average paid streaming memberships increased 23% year over year in Q4, while average revenue per membership was flat year over year both on a reported and foreign exchange (F/X) neutral basis. Revenue was 1% higher than our guidance forecast, as paid net adds exceeded our 6.0m projection by 2.5m. Operating margin of 14.4% (a 600bps increase from Q4'19) also came in above our guidance, due to higher-than-expected revenue. EPS of $1.19 vs. $1.30 a year ago included a $258m non-cash unrealized loss from F/X remeasurement on our Euro denominated debt.

> For the full year, our 37m paid net additions represented a 31% increase from 2019's 28m paid net adds. We're becoming an increasingly global service with 83% of our paid net adds in 2020 coming from outside the UCAN region. Our EMEA region accounted for 41% of our full year paid net adds, while APAC was the second largest contributor to paid net additions with 9.3m (up 65% year over year).

52. During an earnings call held that day, Defendant Neuman stated that the Company's "long-term growth trajectory is at least as strong as ever. There's just more short-term noise and uncertainty right now, but still very strong underlying growth metrics . . ." While acknowledging a dip in viewing from the height of the pandemic, Defendant Neuman asserted that viewing was "up year-over-year in all regions. Retention is better than it was a year ago."

53. In the same call, Defendant Hastings stated that consumers are "interested and willing to pay more for more content because they're hungry for great stories," and that they would "get that content" by going to other platforms in addition to Netflix. When an analyst posited that the addition of new streaming services "expands the pie . . . for streaming in general" and could "accelerate growth," Defendant Peters responded, "I think you're right."

54. On January 28, 2021, Netflix filed its Form 10-K for 2020 with the SEC. The Form

10-K stated, in relevant part:

> Consolidated revenues for the year ended December 31, 2020 increased 24% as compared to the year ended December 31, 2019.  The increase in our consolidated revenues was due to the 24% growth in average paying memberships and a 1% increase in average monthly revenue per paying membership.  The increase in average monthly revenue per paying membership resulted from our price changes and plan mix, partially offset by unfavorable fluctuations in foreign exchange rates.  Paid net membership additions for the year ended December 31, 2020 increased 31% as compared to the year ended December 31, 2019, as a result of the long term trend toward streaming on demand entertainment and due to the COVID-19 pandemic and resulting social restrictions and local government mandates of home confinement in certain jurisdictions.

55.     On April 20, 2021, Netflix announced its first quarter 2021 financial results, stating

in relevant part:

> Revenue grew 24% year over year and was in line with our beginning of quarter forecast, while operating profit and margin reached all-time highs.  We finished Q1'21 with 208m paid memberships, up 14% year over year, but below our guidance forecast of 210m paid memberships.  We believe paid membership growth slowed due to the big Covid-19 pull forward in 2020 and a lighter content slate in the first half of this year, due to Covid-19 production delays.  We continue to anticipate a strong second half with the return of new seasons of some of our biggest hits and an exciting film lineup.  In the short-term, there is some uncertainty from Covid-19; in the long-term, the rise of streaming to replace linear TV around the world is the clear trend in entertainment.
>
> *        *        *
>
> The extraordinary events of Covid-19 led to unprecedented membership growth in 2020, as it pulled forward growth from 2021, and delayed production across every region.  In turn, we ended 2020 with a bigger membership and revenue base than we would otherwise have had, contributing to record Q1'21 revenues.  And since we were still ramping production levels late last year, we had lower content spend in Q1'21 - content amortization only grew 9.5% year over year in Q1'21 vs. 17% in FY20.  The result was a 10 percentage point year over year jump in our operating margin to 27% in Q1, which is an all-time high.

As we discussed in past letters, these dynamics are also contributing to a lighter content slate in the first half of 2021, and hence, we believe slower membership growth.  In Q1, paid net additions of 4m were below our 6m guidance (and the 16m net additions in the year ago quarter) primarily due to acquisition, as retention in Q1 was in line with our expectations.  We don't believe competitive intensity materially changed in the quarter or was a material factor in the variance as the over-forecast was across all of our regions.  We also saw similar percentage year-over-year declines in paid net adds in all regions . . . , whereas the level of competitive intensity varies by country.

*      *      *

As always, we're focusing on the fundamentals of our business, which remain healthy.  In addition to our record financial results, engagement per member household grew solidly year over year in Q1'21.  We're also seeing how much members value Netflix with Q1'21 churn below Q1'20 levels, demonstrating that as we improve the service, we can charge a bit more.  Our FY21 operating margin target of 20% vs. 18% last year remains unchanged.  We are optimistic about the future and believe we are still in the early days of the adoption of internet entertainment, which should provide us with many years of growth ahead

56.     During an earnings call held that day, Defendant Neumann assured investors that the "business remains healthy" despite "noise in the near term" related to the pandemic.  Defendant Neuman waved away any worries about COVID-19's impact on the Company, stating:  "As you know, the extraordinary events of COVID have had a big impact on the world, continue to have a big impact on the world.  And for us, at a minimum, it creates just some short-term choppiness in some of the business trends that we see in our business." Defendant Hastings downplayed concerns over the competitive environment, claiming that the industry is "intensely competitive, but it always has been."  Defendant Hastings assured investors that "[Netflix will] get back to much steadier state in the back half of the year."

57.     On July 20, 2021, Netflix announced its second quarter 2021 financial results,

stating in relevant part:

> Revenue growth was driven by an 11% increase in average paid streaming memberships and 8% growth in average revenue per membership (ARM).  ARM rose 4%, excluding a foreign exchange (FX) impact of +$277m. Operating margin of 25.2% expanded 3 percentage points compared with the year ago quarter.  EPS of $2.97 vs. $1.59 a year ago included a $63m non-cash unrealized loss from FX remeasurement on our Euro denominated debt.
>
> The pandemic has created unusual choppiness in our growth and distorts year-over-year comparisons as acquisition and engagement per member household spiked in the early months of COVID.  In Q2'21, our engagement per member household was, as expected, down vs. those unprecedented levels but was still up 17% compared with a more comparable Q2'19.  Similarly, retention continues to be strong and better than pre-COVID Q2'19 levels, even as average revenue per membership has grown 8% over this two-year period, demonstrating how much our members value Netflix and that as we improve our service we can charge a bit more.
>
> We added 1.5m paid memberships in Q2, slightly ahead of our 1.0m guidance forecast.  The APAC region represented about two-thirds of our global paid net adds in the quarter.  As expected, Q2 paid memberships in the UCAN region were slightly down sequentially (-0.4m paid net adds).  We believe our large membership base in UCAN coupled with a seasonally smaller quarter for acquisition is the main reason for this dynamic.  This is similar to what we experienced in Q2'19 when our UCAN paid net adds were -0.1m; since then we've added nearly 7.5m paid net adds in UCAN.

58.     Speaking at the earnings call that day, Defendant Neumann attributed the "choppiness" in growth to the after-effect of the "big pull forward in 2020" and reassured investors that the "business is performing well." Neumann emphasized that Netflix was "roughly 20% penetrated in broadband homes," and with 800 million to 900 million worldwide that could potentially buy a Netflix subscription there was no reason why Netflix could not "be in all or most of those homes over time if we're doing our job." In the United States and Canada, Neumann said that only 26% of viewing consumption was through a streaming service, within which Netflix was

only 7% of consumption.

59.     On October 19, 2021, Netflix announced its third quarter 2021 financial results in

a letter to shareholders that stated, in relevant part:

> After a lighter-than-normal content slate in Q1 and Q2 due to COVID-related production delays in 2020, we are seeing the positive effects of a stronger slate in the second half of the year.  In Q3, we grew revenue 16% year over year to $7.5 billion, while operating income rose 33% vs. the prior year quarter to $1.8 billion.  We added 4.4m paid net adds (vs. 2.2m in Q3'20) to end the quarter with 214m paid memberships.  We're very excited to finish the year with what we expect to be our strongest Q4 content offering yet, which shows up as bigger content expense and lower operating margins sequentially.
>
> *          *          *
>
> We under-forecasted paid net adds for the quarter (4.4m actual vs. our 3.5m projection), while ending paid memberships of 214m was within 0.4% of our forecast.  For the second consecutive quarter, the APAC region was our largest contributor to membership growth with 2.2m paid net adds (half of total paid net adds) as we are continuing to improve our service in this region.  In EMEA, paid net adds of 1.8m improved sequentially vs. the 188k in Q2 as several titles had a particularly strong impact.  The UCAN and
> LATAM regions grew paid memberships more slowly.  These regions have higher penetration of broadband homes although we believe we still have ample runway for growth as we continue to improve our service.
>
> As a reminder, the quarterly guidance we provide is our actual internal forecast at the time we report and we strive for accuracy.  For Q4'21, we forecast paid net adds of 8.5m, consistent with Q4'20 paid net additions.  For the full year 2021, we forecast an operating margin of 20% or slightly better.  This means that Q4'21 operating margin will be approximately 6.5% compared with 14% in Q4'20.  The year over year decline in operating margin is due mostly to our backloaded big content release schedule in this Q4, which will result in a roughly 19% year over year increase in content amortization for Q4'21 (compared with ~8% growth year to date).

60.     Netflix held a conference call that day to discuss the financial results with analysts

and investors.  During the call, Defendant Neuman stated that Netflix had "the ability, we believe, to grow across all those content categories for the foreseeable future, some more than others, right, in terms of pace of growth.  So some of those are just earlier and higher growth, but we're growing across all those content categories, and we don't see a ceiling for the foreseeable future." Defendant Neuman assured investors that "the business remained healthy as it had been throughout the year with churn at low levels, down prior to the comparable periods both in 2020 and two years ago pre-COVID in 2019." He also stated that management "expect[ed] to continue in terms of that healthy retention and then this kind of acceleration as we get past those initial market reopenings with COVID [and] past the COVID pull forwarding into the strength of our slate . . . ."

61.      The above statements were materially false and/or misleading, and failed to disclose material adverse facts about the Company's business, operations, and prospects. Specifically, Defendants failed to disclose to investors that: (1) account sharing by customers and increased competition from other streaming services were becoming significant headwinds; (2) the Company was experiencing difficulties retaining customers; (3) as a result of the foregoing, the Company's growth was decelerating; (4) as a result of the foregoing, the Company's financial results were being adversely affected; and (5) as a result of the foregoing, Defendants' positive statements about the Company's business, operations, and prospects were materially false and/or misleading and/or lacked a reasonable basis.

62.      On January 20, 2022, after the market closed, Netflix revealed that it had "slightly over-forecasted paid net adds in Q4." In a letter to shareholders, Netflix announced its fourth quarter 2021 financial results and stated, in relevant part:

> Full year revenue of $30 billion grew 19% year over year while operating income of $6.2 billion rose 35% year over year.  We finished Q4 with 222m paid memberships (with 8.3m paid net adds

13

in Q4).  Even in a world of uncertainty and increasing competition, we're optimistic about our long-term growth prospects as streaming supplants linear entertainment around the world.

\*        \*        \*

We slightly over-forecasted paid net adds in Q4 (8.3m actual compared to the 8.5m paid net adds in both the year ago quarter and our beginning of quarter projection).  For the full year 2021, paid net adds totaled 18m vs 37m in 2020.  Our service continues to grow globally, with more
than 90% of our paid net adds in 2021 coming from outside the UCAN region.

Nonetheless, our UCAN region added 1.2m paid memberships in Q4'21 (vs. 0.9m last year), marking our strongest quarter of member growth in this region since the early days of COVID-19 in 2020.  In APAC, we increased paid memberships by 2.6m (vs. 2.0m in the year ago quarter) with strong growth in both Japan and India.  EMEA was our largest contributor to paid net adds in Q4 (3.5m vs. 4.5m in the prior year period) and the region delivered record quarterly revenue, exceeding $2.5 billion for the first time.  LATAM paid net adds totaled 1.0m vs. 1.2m last year.

\*        \*        \*

 For Q1'22, we forecast paid net adds of 2.5m vs. 4.0m in the year ago quarter.  Our guidance reflects a more back- end weighted content slate in Q1'22 (for example, Bridgerton S2 and our new original film The Adam Project will both be launching in March).  In addition, while retention and engagement remain healthy, acquisition growth has not yet re-accelerated to pre-Covid levels.  We think this may be due to several factors including the ongoing Covid overhang and macro-economic hardship in several parts of the world like LATAM.

\*        \*        \*

Consumers have always had many choices when it comes to their entertainment time - competition that has only intensified over the last 24 months as entertainment companies all around the world develop their own streaming offering.  While this added competition may be affecting our marginal growth some, we continue to grow in every country and region in which these new streaming alternatives have launched.   This reinforces our view that the greatest

> opportunity in entertainment is the transition from linear to streaming and that with under 10% of total TV screen time in the US, our biggest market, Netflix has tremendous room for growth if we can continue to improve our service.

63.     The same day, Netflix held a conference call to discuss the financial results with analysts and investors.  During the call, Defendant Neumann stated that "overall, the business was healthy.  Retention was strong.  Churn was down." He continued that "acquisition was growing, just not growing quite as fast as we were perhaps hoping or forecasting," which was "probably a bit of just overall COVID overhang that's still happening . . . [and] some macroeconomic strain in some parts of the world . . .." Defendant Sarandos also pointed to the pandemic as having the "created a lot of bumpiness certainly and not steady linear growth, which makes it a little tougher to predict[.]" However, according to Defendant Sarandos, "all the fundamentals of the business are pretty solid."

64.     On this news, the Company's stock price fell $110.75, or nearly 22%, to close at $397.50 per share on January 21, 2022, on unusually heavy trading volume.

65.     On January 27, 2022, Netflix filed with the SEC on Form 10-K its annual report for the period ended December 31, 2021.  Therein, the Company provided the following risk disclosures:

> If our efforts to attract and retain members are not successful, our business will be adversely affected.
>
> We have experienced significant membership growth over the past several years.  Our penetration and growth rates vary between the jurisdictions where we provide our service.  In countries where we have been operating for many years or where we are highly penetrated, our membership growth is slower than in newer or less penetrated countries.  Our ability to continue to attract and retain members will depend in part on our ability to consistently provide our members in countries around the globe with compelling content choices, effectively drive conversation around our content and

service, as well as provide a quality experience for choosing and enjoying TV series, documentaries, feature films and mobile games. Furthermore, the relative service levels, content offerings, pricing and related features of competitors to our service may adversely impact our ability to attract and retain memberships. Competitors include other entertainment video providers, such as MVPDs, and streaming entertainment providers (including those that provide pirated content), video gaming providers, as well as user-generated content, and more broadly other sources of entertainment that our members could choose in their moments of free time.

If consumers do not perceive our service offering to be of value, including if we introduce new or adjust existing features, adjust pricing or service offerings, or change the mix of content in a manner that is not favorably received by them, we may not be able to attract and retain members. We have recently expanded our entertainment video offering to include games. If our efforts to develop and offer games are not valued by our current and future members, our ability to attract and retain members may be negatively impacted. We may, from time to time, adjust our membership pricing, our membership plans, or our pricing model itself, which may not be well-received by consumers, and which may result in existing members canceling our service or fewer new members joining our service. In addition, many of our members rejoin our service or originate from word-of-mouth advertising from existing members. If our efforts to satisfy our existing members are not successful, we may not be able to attract members, and as a result, our ability to maintain and/or grow our business will be adversely affected. Members cancel our service for many reasons, including a perception that they do not use the service sufficiently, the need to cut household expenses, availability of content is unsatisfactory, competitive services provide a better value or experience and customer service issues are not satisfactorily resolved. Membership growth is also impacted by seasonality, with the fourth quarter historically representing our greatest growth, as well as the timing of our content release schedules. We must continually add new memberships both to replace canceled memberships and to grow our business beyond our current membership base. While we currently permit multiple users within the same household to share a single account for non-commercial purposes, if multi-household usage is abused or if our efforts to restrict multi-household usage are ineffective, our ability to add new members may be hindered and our results of operations may be adversely impacted. If we do not grow as expected, given, in particular, that our content costs are largely fixed in nature and contracted over several years, we may not be able to adjust our

expenditures or increase our (per membership) revenues commensurate with the lowered growth rate such that our margins, liquidity and results of operation may be adversely impacted. If we are unable to successfully compete with current and new competitors in providing compelling content, retaining our existing memberships and attracting new memberships, our business will be adversely affected.

66.    The above statements were materially false and/or misleading, and failed to disclose material adverse facts about the Company's business, operations, and prospects. Specifically, Defendants failed to disclose to investors that: (1) account sharing by customers and increased competition from other streaming services were becoming significant headwinds; (2) the Company was experiencing difficulties retaining customers; (3) as a result of the foregoing, the Company's growth was decelerating; (4) as a result of the foregoing, the Company's financial results were being adversely affected; and (5) as a result of the foregoing, Defendants' positive statements about the Company's business, operations, and prospects were materially false and/or misleading and/or lacked a reasonable basis.

67.    On April 19, 2022, after the market closed, Netflix reported that it had lost 200,000 subscriptions during the first quarter of 2022, well under the paid net add guidance of 2.5 million. In a letter to shareholders, Netflix explained:

> Paid net additions were -0.2m compared against our guidance forecast of 2.5m and 4.0m in the same quarter a year ago. The suspension of our service in Russia and winding-down of all Russian paid memberships resulted in a -0.7m impact on paid net adds; excluding this impact, paid net additions totaled +0.5m. The main challenge for membership growth is continued soft acquisition across all regions. Retention was also slightly lower relative to our guidance forecast, although it remains at a very healthy level (we believe among the best in the industry). Recent
> price changes are largely tracking in-line with our expectations and remain significantly revenue positive.

In EMEA (-0.3M paid net adds, or +0.4m excluding the Russia impact), we saw a slowdown in our business in Central and Eastern Europe in March, coinciding with Russia's invasion of Ukraine. Paid net additions in LATAM totaled -0.4M; similar to recent quarters, we believe a combination of forces including macroeconomic weakness and our price changes (F/X neutral ARM grew 20% year over year) were a drag on our membership growth. UCAN paid net adds of -0.6M was largely the result of our price change which is tracking in-line with our expectations and is significantly revenue positive. We're making good progress in APAC where we see nice growth in a variety of markets including Japan, India, Philippines, Thailand and Taiwan.

As a reminder, the quarterly guidance we provide is our actual internal forecast at the time we report. For Q2'22, we forecast paid net additions of -2.0m vs. +1.5m in the year ago quarter. Our forecast assumes our current trends persist (such as slow acquisition and the near term impact of price changes) plus typical seasonality (Q2 paid net adds are usually less than Q1 paid net adds). We project revenue to grow approximately 10% year over year in Q2, assuming roughly a mid-to-high single digit year over year increase in ARM on a F/X neutral basis. We still target a 19%-20% operating margin for the full year 2022, assuming no material swings in F/X rates from when we set this goal in January of 2022.

68. The letter to shareholders stated that Netflix is "not growing revenue as fast as we'd like." It further stated: "COVID clouded the picture by significantly increasing our growth in 2020, leading us to believe that most of our slowing growth in 2021 was due to the COVID pull forward." However, Netflix newly attributed the slowing revenue growth to four factors, including rampant account sharing and competition with other streaming services. Specifically, the letter stated, in relevant part:

First, it's increasingly clear that the pace of growth into our underlying addressable market (broadband homes) is partly dependent on factors we don't directly control, like the uptake of connected TVs (since the majority of our viewing is on TVs), the adoption of on-demand entertainment, and data costs. We believe these factors will keep improving over time, so that all broadband households will be potential Netflix customers.

Second, in addition to our 222m paying households, we estimate that Netflix is being shared with over 100m additional households, including over 30m in the UCAN region.  Account sharing as a percentage of our paying membership hasn't changed much over the years, but, coupled with the first factor, means it's harder to grow membership in many markets - an issue that was obscured by our COVID growth.

Third, competition for viewing with linear TV as well as YouTube, Amazon, and Hulu has been robust for the last 15 years.  However, over the last three years, as traditional entertainment companies realized streaming is the future, many new streaming services have also launched.  While our US television viewing share, for example, has been steady to up according to Nielsen, we want to grow that share faster.  Higher view share is an indicator of higher satisfaction, which supports higher retention and revenue.

Fourth, macro factors, including sluggish economic growth, increasing inflation, geopolitical events such as Russia's invasion of Ukraine, and some continued disruption from COVID are likely having an impact as well.

69.     On this news, the Company's share price fell $122.42, or over 35%, to close at $226.19 per share on April 20, 2022, on unusually heavy trading volume.

## A.     The Board Breached its Fiduciary Duties

70.     As officers and/or directors of Netflix, the Defendants owed Netflix fiduciary duties of good faith, loyalty, and candor, and were and are required to use their utmost ability to control and manage Netflix in a fair, just, honest and equitable manner.  The conduct of the Director Defendants involves a knowing or reckless violation of their obligations as directors and officers of Netflix, the absence of good faith on their part, and a reckless disregard for their duties to the Company that Director Defendants were aware or should have been aware posed a risk of serious injury to the Company.

71.     Defendants, because of their positions of control and authority as directors and/or officers of Netflix, were able to and did exercise control over the wrongful acts complained of

herein.  As officers and/or directors of a publicly traded company, the Defendants had a duty to prevent the dissemination of inaccurate and untruthful information regarding Netflix's financial condition, performance, growth, operations, financial statements, business, management, earnings, internal controls, and business prospects, so as to ensure that the market price of the Company's common stock would be based upon truthful and accurate information.

72.     To discharge their duties, the officers and directors of Netflix were required to exercise reasonable and prudent supervision over the management, policies, practices and controls of the Company.  By virtue of such duties, the officers and directors and Netflix were required to, among other things:

a.   Ensure that the Company complied with its legal obligations and requirements, including acting only within the scope of its legal authority and disseminating truthful and accurate statements to the SEC and the Company's stockholders;

b.   Conduct the affairs of the Company in a lawful, efficient, business-like manner to provide the highest quality performance of its business, to avoid wasting the Company's assets, and to maximize the value of the Company's stock;

c.   Properly and accurately guide investors and analysts as to the true financial condition of the Company at any given time, including making accurate statements about the Company's financial results and prospects, and ensuring that the Company maintained an adequate system of financial controls such that the Company's financial reporting would be true and accurate at all times;

d.   Remain informed as to how the Company conducted its operations, and, upon receipt of notice or information of imprudent or unsound conditions or practices, make reasonable inquiry in connection therewith, and take steps to correct such conditions or practices and make such disclosures as necessary to comply with federal and state securities laws; and

e.   Ensure that the Company is operated in a diligent, honest, and prudent manner in compliance with all applicable federal, state, and local laws, rules and regulations.

73.   The conduct of the Defendants complained of herein involves a knowing and culpable violation of their obligations as officers and directors of the Company, the absence of good faith on their part, or a reckless disregard for their duties to the Company and its stockholders, which the Defendants were aware, or should have been aware, posed a risk of serious injury to the Company.

74.   Pursuant to the Audit Committee Charter, the purpose of the Audit Committee shall be: "to provide oversight and monitoring of (i) the Company's accounting and financial reporting processes and policies, (ii) the Company's systems of internal controls over financial reporting, (iii) the integrity of the Company's financial statements, (iv) audits of the Company's financial statements and (v) the independent auditors' qualifications, independence and performance; to provide the Board with the results of its monitoring and recommendations derived therefrom; to assist the Board in ensuring the Company's compliance with legal and regulatory requirements in connection with the Company's financial reporting process; and to provide to the Board such additional information and materials as it may deem necessary to make the Board aware of significant financial matters that require the attention of the Board."

75.   Pursuant to the Audit Committee Charter, the scope of the responsibilities of the Audit Committee shall include:

   a.   Providing oversight and monitoring of the activities of Company management, including without limitation, the chief financial officer and principal accounting officer and controller, the Company's internal audit function and the independent auditors with respect to the Company's financial reporting and compliance process, as well as oversight and monitoring of the Company's internal audit function generally;

   b.   Reviewing on a continuing basis the adequacy and effectiveness of the Company's system of internal controls over financial reporting as well as the Company's disclosure controls and procedures, and the Company's risk assessment and risk management policies related to financial and legal risk, including cybersecurity

risk;

c.  Appointing, compensating, retaining, terminating and overseeing the Company's
    independent auditors (including resolving disagreements between management and
    the independent auditors regarding financial reporting), for the purpose of
    preparing or issuing an audit report or performing other audit, review or attest
    services for the Company, for which the Audit Committee shall have sole and
    absolute authority;

d.  Pre-approving audit and non-audit services provided to the Company by the
    Company's independent auditors either (i) before the auditors are engaged by the
    Company for such services or (ii) pursuant to pre-approval policies and procedures
    established by the Audit Committee, provided that the Audit Committee is
    informed of each specific service;

e.  Reviewing the independent auditors' proposed audit scope, approach and
    independence;

f.  Ensuring that the independent auditors must report directly to the audit committee
    and reviewing the performance of the independent auditors, who shall be
    accountable to the Board and the Audit Committee as the representatives of the
    stockholders of the Company, and recommending to the Board and stockholders
    the appointment of the independent auditors;

g.  Requesting and receiving from the independent auditors on a periodic basis, but at
    least annually, a formal written statement delineating all relationships between the
    auditor and the Company which may adversely impact the auditors' independence
    and based on such review, assessing the independence of the auditors, actively
    engaging in a dialogue with the independent auditor with respect to any disclosed
    relationships or services that may impact the objectivity and independence of the
    auditor and for taking, or recommending that the full Board take appropriate action
    to oversee the independence of the outside auditor;

h.  Obtaining and reviewing on a periodic basis a report from the independent auditors
    describing the auditors' internal quality-control procedures, any material issues
    raised by the most recent internal quality-control review or peer review or by any
    inquiry or investigation by governmental or professional authorities, within the
    preceding five years, respecting one or more independent audits carried out by the
    firm and any steps taken to deal with such issues;

i.  Establishing a policy regarding the Company's hiring of current or former
    employees of the Company's independent auditors;

j.  Directing the Company's independent auditors to review before filing with the
    Securities and Exchange Commission the Company's interim financial statements

22

included in Quarterly Reports on Form 10-Q, using professional standards and procedures for conducting such reviews;

k.  Reviewing before release the unaudited quarterly and audited annual operating results in the Company's quarterly and annual earnings releases;

l.  Discussing with the Company's independent auditors the financial statements and audit findings, including any significant adjustments, management judgments and accounting estimates, significant new accounting policies and disagreements with management and any other matters required to be discussed by (i) Auditing Standards No. 1301, as it may be modified or supplemented, or (ii) the applicable requirements of the Public Company Accounting Oversight Board (PCAOB) or the Securities and Exchange Commission;

m.  Reviewing with management, before release, the audited financial statements and Management's Discussion and Analysis of Financial Condition and Results of Operations included in the Company's Annual Report on Form 10-K, and recommending to the Board following such review, if appropriate, that the audited financial statements be included in such Annual Report on Form 10-K;

n.  Providing a report in the Company's proxy statement in accordance with the requirements of Item 407 of Regulation S-K and Item 7 of Schedule 14A, or any successor provisions;

o.  Reviewing, in conjunction with legal counsel, any legal matters that could have a significant impact on the Company's financial statements;

p.  Establishing procedures for receiving, retaining and treating complaints received by the Company regarding accounting, internal accounting controls, auditing matters or fraudulent financial reporting and procedures for the confidential, anonymous submission by employees of concerns regarding questionable accounting, internal controls or auditing matters;

q.  Reviewing at least annually the Audit Committee's own structure, processes and membership requirements;

r.  Providing oversight and review of the Company's asset management policies, including without limitation an annual review of the Company's investment policies and performance for cash and short-term investments;

s.  Reviewing and approving related party transactions for potential conflicts of interests;

t.  If necessary, instituting special investigation(s) and, as appropriate, hiring special

counsel or experts to assist in such investigation(s);

u.  Reviewing and reassessing the adequacy of this Charter on not less than an annual basis; and

v.  Performing such other duties as may be requested by the Board.

76.   In violation of the Audit Committee Charter, and their general duties as members of the Audit Committee, Defendants on the Audit Committee, Mather, Kilgore, Barton, conducted little, if any, oversight of the Company's internal controls over financial reporting, resulting in materially false and misleading statements regarding the Company's business and consciously disregarded their duties to monitor such controls.  The Audit Committee's complete failure to perform their duties in good faith resulted in misrepresentations to the public and the Company's stockholders.

77.   In addition, as officers and directors of a publicly-traded company whose common stock was registered with the SEC pursuant to the Exchange Act, the Defendants had a duty not to effect the dissemination of inaccurate and untruthful information with respect to the Company's financial condition, performance, growth, operations, financial statements, business, products, management, earnings, internal controls, and present and future business prospects, so that the market price of the Company's common stock would be based upon truthful and accurate information. Accordingly, the Defendants breached their fiduciary duties by knowingly or recklessly causing the Company to make false and misleading statements of material fact about the Company's maintaining adequate internal controls and compliance with applicable rules and regulations.

78.   The Defendants' flagrant violations of their fiduciary duties and unwillingness to heed the requirements of their company's Code of Ethics and Audit Committee Charter have

inflicted, and will continue to inflict, significant harm on CVS.

## DERIVATIVE ALLEGATIONS

79.     Plaintiff brings this action derivatively in the right and for the benefit of Netflix to redress injuries suffered by Netflix as a direct result of the Director Defendants' breaches of fiduciary duty.  Netflix is named as a nominal defendant solely in a derivative capacity.  This is not a collusive action to confer jurisdiction on this Court that it would not otherwise have.

80.     Plaintiff will adequately and fairly represent the interests of Netflix in enforcing and prosecuting the Company's rights.

81.     Plaintiff was a stockholder of Netflix at the time of the wrongdoing complained of, has continuously been a stockholder since that time, and is currently a Netflix stockholder.

## DEMAND FUTILITY ALLEGATIONS

82.     Plaintiff repeats, re-alleges, and incorporates by reference each and every allegations set forth as though fully set forth herein.

83.     The Netflix Board currently has 12 members: Defendants Hastings, Sarandos, Hoag, Mather, Haley, Kilgore, Masiyiwa, Barton, Belmer, Döpfner, Smith and Sweeney.

84.     Plaintiff has not made any demand on Netflix's current Board to institute this action against the Director Defendants, as any pre-suit demand would be excused.  The Board is incapable of making an independent and disinterested decision to institute and vigorously prosecute this action.

### 1.   Director Defendants Face a Substantial Likelihood of Liability

85.     As alleged above, Defendant Hastings breached his fiduciary duties by negligently issuing the materially false and misleading statements touting the financial position of the Company despite Netflix's substantial loss of subscriptions Accordingly, Defendant Hastings

faces a substantial likelihood of negligence liability for issuing the false and misleading statements and any demand upon him is therefore futile.

86.     The Director Defendants face a substantial likelihood of liability for their individual misconduct.  As alleged above, the Director Defendants breached their fiduciary duties by allowing the Company to issue the materially false and misleading statements described above.  The Director Defendants had a duty to ensure that the Company's SEC filings, press releases, and other public statements and presentations concerning its business, operations, prospects, internal controls, and financial statements were accurate.

87.     In addition, the Director Defendants owed a duty to, in good faith and with due diligence, exercise reasonable inquiry, oversight, and supervision to ensure that the Company's internal controls were sufficiently robust and effective (and/or were being implemented effectively), and to ensure that the Board's duties were being discharged in good faith and with the required diligence and due care.  Instead, the Director Defendants knowingly and/or with reckless disregard reviewed, authorized, and/or caused the publication of the materially false and misleading statements discussed above that caused the Company's stock to trade at artificially inflated prices and misrepresented the financial health of Netflix.

88.     The Director Defendants' making or authorization of these false and misleading statements, failure to timely correct such statements, failure to take necessary and appropriate steps to ensure that the Company's internal controls were sufficiently robust and effective (and/or were being implemented effectively), and failure to take necessary and appropriate steps to ensure that the Board's duties were being discharged in good faith and with the required due diligence constitute breaches of fiduciary duties that have resulted in the Director Defendants facing a substantial likelihood of liability. If the Director Defendants were to bring a suit on behalf of

Netflix to recover damages sustained as a result of this misconduct, they would expose themselves and their colleagues to significant liability. For this reason, demand is futile as to the Director Defendants.

### 2. Demand Upon Defendant Hastings is Futile

89. As a Co-CEO of Netflix, Defendant Hastings depends upon his position as a Company insider for his livelihood and thus is not independent. Similarly, Netflix identifies Defendant Hastings as being not independent in annual proxy statements filed with the SEC.

90. Hastings has "long-standing business relationships with several of the other directors, which precludes him from acting in an independent and disinterested manner." Defendant Hastings co-founded Netflix in 1997 and hired Defendant Sarandos in 1999. Defendant Kilgore served as Chief Marketing Officer for Netflix from 2000 to 2012 and joined the Netflix Board in 2012.

91. Defendant Hoag serves as a General Partner of Technology Crossover Ventures ("TCV"), a venture capital firm co-founded by Hoag in 1995, and which invested in Netflix. Defendant Hoag has served as a director of Netflix since 1999. Defendant Smith served as General Counsel of Microsoft from 2002 until 2015, when he was named President and Chief Legal Officer, and currently serves as Microsoft's President and Vice Chair. Defendant Hastings served on Microsoft's Board from 2007 until 2012. Defendant Smith joined the Netflix Board in 2015.

92. Defendant Hastings is named as a defendant in the pending Securities Class Actions.

### 3. Demand Upon Defendant Sarandos is Futile

93. As a Co-CEO of Netflix, Defendant Sarandos depends upon his position as a Company insider for his livelihood and thus is not independent. Similarly, Netflix identifies

Defendant Sarandos as being not independent in annual proxy statements filed with the SEC. Defendant Sarandos has worked with Defendant Hastings for more than 20 years, and worked with Defendant Kilgore for 12 years before Defendant Kilgore joined the Board.

94.     Defendant Sarandos is named as a defendant in the pending Securities Class Actions.

#### 4.   Demand Upon Defendant Barton is Futile

95.     One of the Audit Committee's responsibilities is to review the Company's annual audited financial statements, quarterly financial statements, analyses or other written communications prepared by management in connection with the financial statements, and the critical accounting policies and practices of the Company.   The Audit Committee was thus responsible for reviewing and approving Netflix's earnings releases, which include press releases, as well as Forms 10-Q and 10-K filed between January 19, 2021 and April 19, 2022.   Defendant Barton was a member of the Audit Committee during the relevant time period and thus knowingly or recklessly allowed the publishing of the false and misleading statements related to the Company's earnings guidance and financial and disclosure controls.   Accordingly, Defendant Barton breached his fiduciary duties of loyalty and good faith because he participated in the misconduct described above.   He faces a substantial likelihood of liability for these breaches, making any demand futile.

96.     In addition, Defendant Barton has "long-standing business relationships with several of the other directors, which precludes him from acting in an independent and disinterested manner." Barton co-founded Zillow in 2005 and serves as Zillow's CEO.   Defendant Hoag has been a director of Zillow since its founding.   Defendant Hoag serves as a General Partner of Technology Crossover Ventures ("TCV"), a venture capital firm co-founded by Hoag in 1995, and

which "owns significant equity in Zillow as part of its portfolio, as well as Netflix." Defendant Hoag is part of the investment team responsible for the Zillow investment. TCV also lists Expedia as a portfolio company, "which Barton co-founded and served as President and CEO from 1999 until 2003." Defendant Hoag served on the board of directors for Expedia from 2000 to 2003.

97.     Defendant Barton was a venture partner at Benchmark Capital, a venture capital fund, from 2005 until 2018. Defendant Barton led an investment round in Nextdoor.com while at Benchmark Capital. Defendant Haley's venture capital firm, Redpoint Ventures, also invested in Nextdoor.com. Defendant Barton was a member of Nextdoor.com's board of directors for years.

### 5. Demand Upon Defendant Haley is Futile

98.     Defendant Haley has "long-standing business relationships with several of the other directors, which precludes him from acting in an independent and disinterested manner." Defendant Haley's venture capital firm, Redpoint Ventures, is a large investor in Nextdoor.com. Defendant Barton sat on Nextdoor.com's board of directors while the venture capital firm he worked for invested in the company. Defendant Haley is a member of the Zuora board of directors, having joined as part of an investment round led by Redpoint Ventures and joined by Benchmark Capital, where Defendant Barton worked. Defendant Haley also serves on the board of directors of 2U, where Defendant Peters also serves as a director. Defendant Peters is named as a defendant in one of the pending Securities Class Actions.

### 6. Demand Upon Defendant Hoag is Futile

99.     Defendant Hoag has been a member of the Board since 1999. Defendant Hoag serves as a General Partner of Technology Crossover Ventures ("TCV"), a venture capital firm co-

founded by Hoag in 1995, and which invested in Netflix.

100.    Barton co-founded Zillow in 2005 and serves as Zillow's CEO.  Defendant Hoag has been a director of Zillow since its founding.  Defendant Hoag serves as a General Partner of Technology Crossover Ventures ("TCV"), a venture capital firm co-founded by Hoag in 1995, and which "owns significant equity in Zillow as part of its portfolio, as well as Netflix."  Defendant Hoag is part of the investment team responsible for the Zillow investment.  TCV also lists Expedia as a portfolio company, "which Barton co-founded and served as President and CEO from 1999 until 2003." Defendant Hoag served on the board of directors for Expedia from 2000 to 2003.

### 7.  Demand Upon Defendant Kilgore is Futile

101.    One of the Audit Committee's responsibilities is to review the Company's annual audited financial statements, quarterly financial statements, analyses or other written communications prepared by management in connection with the financial statements, and the critical accounting policies and practices of the Company.  The Audit Committee was thus responsible for reviewing and approving Netflix's earnings releases, which include press releases, as well as Forms 10-Q and 10-K filed between January 19, 2021 and April 19, 2022.  Defendant Kilgore was a member of the Audit Committee during the relevant time period and thus knowingly or recklessly allowed the publishing of the false and misleading statements related to the Company's earnings guidance and financial and disclosure controls.  Accordingly, Defendant Kilgore breached his fiduciary duties of loyalty and good faith because he participated in the misconduct described above.  He faces a substantial likelihood of liability for these breaches, making any demand futile.

102.    Defendant Kilgore also has long-standing ties to several of the other directors and Defendants.  Defendant Kilgore served as Netflix's chief Marketing Officer from 2000 until 2012.

30

In that role, Defendant Kilgore worked closely with Defendants Hastings and Sarandos.  Defendant Kilgore joined the Board in 2012.

### 8.   Demand Upon Defendant Mather is Futile

103.   One of the Audit Committee's responsibilities is to review the Company's annual audited financial statements, quarterly financial statements, analyses or other written communications prepared by management in connection with the financial statements, and the critical accounting policies and practices of the Company.  The Audit Committee was thus responsible for reviewing and approving Netflix's earnings releases, which include press releases, as well as Forms 10-Q and 10-K filed between January 19, 2021 and April 19, 2022.  Defendant Mather was a member of the Audit Committee during the relevant time period and thus knowingly or recklessly allowed the publishing of the false and misleading statements related to the Company's earnings guidance and financial and disclosure controls.  Accordingly, Defendant Mather breached his fiduciary duties of loyalty and good faith because he participated in the misconduct described above.  He faces a substantial likelihood of liability for these breaches, making any demand futile.

### 9.   Demand Upon Defendant Smith is Futile

104.   Defendant Smith served as General Counsel of Microsoft from 2002 until 2015, when he was named President and Chief Legal Officer, and currently serves as Microsoft's President and Vice Chair.  Defendant Hastings served on Microsoft's Board from 2007 until 2012.

Defendant Smith joined the Netflix Board in 2015.

## CLAIMS FOR RELIEF

### COUNT I
### Breach of Fiduciary Duty
### (Derivatively Against The Director Defendants)

105.    Plaintiff incorporates each and every allegation set forth above as if fully set forth herein.

106.    Each of the Defendants owed and owes Netflix the highest obligations of loyalty, good faith, due care, and oversight.

107.    Each of the Defendants violated and breached their fiduciary duties of loyalty, good faith, candor and oversight to the Company.

108.    The Director Defendants' conduct set forth herein was due to their intentional or reckless breach of the fiduciary duties they owed to the Company.  In breach of their fiduciary duties, the Director Defendants failed to maintain an adequate system of oversight, disclosure controls and procedures, and internal controls.

109.    In addition, the Director Defendants further breached their fiduciary duties owed to Netflix by willfully or recklessly making and/or causing the Company to make false and misleading statements and omissions of material fact and allowing the Company to operate with inadequate internal controls which resulted in the misrepresentations and failure to disclose that: (1) account sharing by customers and increased competition from other streaming services were becoming significant headwinds; (2) the Company was experiencing difficulties retaining customers; (3) the Company's growth was decelerating; (4) the Company's financial results were being adversely affected; and (5) Defendants' positive statements about the Company's business,

operations, and prospects were materially false and/or misleading and/or lacked a reasonable basis.

110.    The Director Defendants failed to correct and cause the Company to fail to rectify any of the wrongs described herein or correct the false and misleading statements and omissions of material fact, exposing them to personal liability to the Company for breaching their fiduciary duties.

111.    The Director Defendants had actual or constructive knowledge that they had caused the Company to improperly engage in the wrongdoing set forth herein and to fail to maintain adequate internal controls.  The Director Defendants had actual knowledge that the Company was engaging in the wrongdoing set forth herein, and that internal controls were not adequately maintained, or acted with reckless disregard for the truth, in that they caused the Company to improperly engage in the wrongdoing and to fail to maintain adequate internal controls, even though such facts were available to them.  Such improper conduct was committed knowingly or recklessly and for the purpose and effect of artificially inflating the price of the Company's securities.  The Director Defendants, in good faith, should have taken appropriate action to correct the schemes alleged herein and to prevent them from continuing to occur.

112.    As a direct and proximate result of the breaches of duty alleged herein, Netflix has sustained and will sustain significant damages.

113.    As a result of the misconduct alleged herein, these Defendants are liable to the Company.

114.    Plaintiff, on behalf of Netflix, has no adequate remedy at law.

**COUNT II**
**Breach of Fiduciary Duty**
**(Derivatively Against Defendants Hastings, Sarandos, and the Officer Defendants)**

115.    Plaintiff incorporates each and every allegation set forth above as if fully set forth

herein.

116.   Defendants Hastings, Sarandos, and the Officer Defendants are executive officers of the Company.   As executive officers, Defendants Hastings, Sarandos, and the Officer Defendants owed and owe Netflix the highest obligations of loyalty, good faith, due care, oversight, and candor.

117.   Defendants Hastings, Sarandos, and the Officer Defendants breached their fiduciary duties owed to Netflix by willfully or recklessly making and/or causing the Company to make false and misleading statements and omissions of material fact, failing to disclose that: (1) account sharing by customers and increased competition from other streaming services were becoming significant headwinds; (2) the Company was experiencing difficulties retaining customers; (3) the Company's growth was decelerating; (4) the Company's financial results were being adversely affected; and (5) Defendants' positive statements about the Company's business, operations, and prospects were materially false and/or misleading and/or lacked a reasonable basis. Defendants Hastings, Sarandos, and the Officer Defendants failed to correct and cause the Company to fail to rectify any of the wrongs described herein or correct the false and misleading statements and omissions of material fact.

118.   As a direct and proximate result of the breaches of duty alleged herein, Netflix has sustained and will sustain significant damages.

119.   As a result of the misconduct alleged herein, Defendants Hastings, Sarandos, and the Officer Defendants are liable to the Company.

120.   Plaintiff, on behalf of Netflix, has no adequate remedy at law.

## RELIEF REQUESTED

WHEREFORE, Plaintiff demands judgment as follows:

A.      Declaring that Plaintiff may maintain this derivative action on behalf of Netflix and that Plaintiff is a proper and adequate representative of the Company;

B.      Against all of the Defendants and in favor of Netflix for the amount of damages sustained by the Company as a result of the acts and transactions complained of herein;

C.      Granting appropriate equitable relief to remedy the Defendants' breaches of fiduciary duties, including, but not limited to the institution of appropriate corporate governance measures;

D.      Awarding Netflix restitution from Defendants, and each of them, and ordering disgorgement of all profits, benefits and other compensation obtained by Defendants;

E.      Awarding Plaintiff the costs and disbursements of this action, including reasonable attorneys' and expert fees and expenses; and

F.      Granting such other and further equitable relief as this Court deems just and proper.

## JURY DEMAND

Plaintiff demands a trial by jury.

Dated:  February 3, 2023

OF COUNSEL:

**ROWLEY LAW PLLC**
Shane Rowley
Danielle Rowland Lindahl
50 Main Street, Suite 1000
White Plains, NY 10606
Telephone: (914) 400-1920

**LONG LAW, LLC**

By:     */s/ Brian D. Long*

Brian D. Long (#43473828)
Kennett Pike, Suite 208
Wilmington, DE 19807
Telephone: (302) 729-9100
Email: BDLong@LongLawDE.com

*Attorneys for Plaintiff*